The following constitutes
the order of the court. Signed July 7, 2014

_____
M. Elaine Hammond
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                           Case No. 12-46534 MEH
                                                Chapter 11
Pacific Thomas Corporation,

                        Debtor.        /

Kyle Everett,                                   Adv. No. 13-04079 AH

                        Plaintiff,

vs.

Randall Whitney, et al.,

                        Defendants.    /

<u>DECISION AFTER TRIAL</u>

    In his complaint, Kyle Everett, Chapter 11 Trustee ("Trustee") for Pacific Thomas Corporation ("PTC") sought declaratory relief regarding the validity of the lease agreement between PTC and Pacific Trading Ventures ("PTV"), an accounting, injunctive relief against PTV and individual defendants Randall Whitney ("Whitney") and Jill Worsley ("Worsley"), and turnover of books and records and funds owed to the estate. Subsequently, the court found that, without admitting its

validity, the Trustee terminated the lease pursuant to its terms, and also terminated a management agreement for cause. On this basis, the court issued its Preliminary Injunction.[1] The Preliminary Injunction (a) required PTV to turnover all rent or other income received related to PTC property, (b) required PTV, Whitney and Worsley to turn over to the Trustee current and historical books and records related to the PTC property, and (c) restrained Whitney and Worsley from entering the property or interfering with the Trustee's transfer of management and operations of PTC's property from PTV to a new management company. At trial, the remaining issues were the validity of the lease and management agreements, whether such agreements (if valid) were terminated, and the Trustee's request for turnover of pre- and post-petition funds from PTV. If the Trustee prevails, the Trustee will further request that the preliminary injunction be made permanent.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This decision after trial constitutes the court's findings and conclusions pursuant to FRBP 7052.

## Applicable Law

At trial, the Trustee asserted claims for declaratory relief and turnover.

Declaratory relief requires an actual controversy and that the controversy relate to a matter within federal court subject matter

---

[1] *See* Docket #76, entered November 18, 2013.

2

jurisdiction. 28 U.S.C. § 2201; *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). The parties stipulated to this court's jurisdiction in the Joint Pretrial Conference Statement.

A finding of an actual case or controversy requires a finding that the case is ripe for adjudication. *Id.* With respect to a dispute sounding in contract, ripeness requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 671 (9th Cir. 2005)(quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The validity of the lease agreement has been disputed since the appointment of the Trustee and must be resolved to allow the Trustee to administer the estate.

The Trustee originally sought turnover of books and records and funds he asserts are owed to the estate. Prior orders addressed the defendants' turnover obligations. At trial, the Trustee seeks a judgment against PTV for funds owing to PTC. As stated on the record, the Trustee does not seek a judgment against Whitney or Worsley. Bankruptcy Code[2] § 541 provides an expansive definition of property of the estate, including all legal or equitable interests of the debtor in property as of the commencement of the case. Bankruptcy Code § 542 requires turnover of property of the estate to the Trustee.

////
////

---

[2] 11 U.S.C. §§ 101, et seq.

3

## Prepetition Management Agreement

In 2003, PTC and PTV entered into a management agreement (the "Management Agreement") for PTV to manage PTC's real property and the self-storage facility located at 2619 East 12th Street in Oakland. The parties agree that PTV managed both the self-storage business and PTV's commercial real properties. As on-going compensation for its services PTV was to receive the greater of $1,500 per month or 6% of the monthly gross revenues actually collected. PTV was also to be compensated at the rate of 10% of the total project cost for supervision of nonrecurring projects greater than $1,000 in value. (Art. VI). The Management Agreement further provides that PTV was responsible for collecting rents from tenants (Art. I, F), maintaining records related to disbursements in connection with management of the premises (Art. VIII, I) and hiring and oversight of employees for the self-storage business (Art. I, A). PTV was authorized to purchase materials, supplies, insurance or other services for multiple properties it managed and charge PTC a pro rata share of the cost (Art. I, D).

The Management Agreement was subsequently amended to extend the term and increase PTV's minimum monthly fee to $2,000 per month.

The parties then entered into a business practice whereby PTV deposited the funds it received from tenants into PTC's accounts upon collection. PTV would receive and record invoices related to the PTC property. PTV would then issue payment and invoice PTC for the funds needed to cover the PTC-related expenses. PTC would promptly transfer the invoiced amounts to PTV. This process continued until PTC's bankruptcy filing.

The Trustee does not contest the validity of the Management Agreement prior to its termination.

## Prepetition Lease Agreement

Two years after the Management Agreement was initially signed, PTC and PTV signed a lease agreement dated January 1, 2005 (the "Lease Agreement") providing for lease of the self-storage facilities by PTV. The Lease Agreement is signed by Whitney, on behalf of PTC, and Worsley, on behalf of PTC. They each signed an agreement to extend the Lease Agreement for an additional five-year term in 2010 (the "Lease Extension").

In addition to the Lease Agreement, PTC and PTV executed a 2008 lease agreement for 1,500 square feet of office space, supposedly included in the Lease Agreement. The 2008 lease agreement makes no reference to the prior Lease Agreement.

The financial terms of the Lease Agreement are substantially different from the Management Agreement. They provide that PTV will pay to PTC monthly rent of $2,500, plus the greater of $22,500 or 40% of the property net operating income on a monthly basis. In essence, the Lease Agreement changes the business operations to make PTV responsible for the self-storage facilities' expenses and then entitles PTV to receive any profits generated from its operation.

Despite this supposed upheaval in the business terms between PTC and PTV, their implementation and accounting of PTV's operation of the self-storage facilities were unchanged. As established by the Trustee's evidence:

5

- PTC's QuickBooks for 2005-2011 include the revenues and expenses of the self-storage facility, these records are used to prepare PTC's profit and loss statements reflecting the same information.
- PTC's tax returns for 2005 - 2011 include the revenues and expenses of operations related to the self-storage facility.
- PTV's QuickBooks for 2005 - 2011 do not include the revenues and expenses of operation related to the self-storage facility.
- The Business Tax Certificate for the self-storage facility is in PTC's name.

PTV's trial brief and the evidence it presented at trial is consistent. PTV's defense of the Trustee's turnover claim further demonstrates the parties' continued course of conduct under the management fee-plus-reimbursement arrangement set forth in the Management Agreement. PTV's evidence includes all invoices issued by PTV in 2006 and 2007. These invoices show that PTV regularly invoiced PTC for expenses incurred in operation of the safe storage facility, and its fees pursuant to the Management Agreement. Further, PTV's invoices reflect prompt payment of these invoices by PTC.

Changes began to occur in 2012. For the first time PTV began to record rental income from the self-storage facility in its QuickBooks records. From January through July 2012, both PTV and PTC recorded the rental income in their QuickBooks. Journal entries in PTV's QuickBooks, posted as of December 31, 2011, seek to shift what was previously PTC revenue onto PTV. The Trustee testified that an audit trail of these journal entries shows these adjustments were entered in

6

late-August 2013, after the bankruptcy was filed.

Finally, five days before PTC filed its bankruptcy petition, representatives of PTC and PTV signed an Amendment and Modification to the Lease Agreement (the "Lease Amendment"). The Lease Amendment purported to shift additional responsibility to PTV. Notably, it substantially increased the rent to be paid by PTV to $70,000 per month and stated PTV "shall continue to be responsible for the operating costs, excepting property taxes, insurance and deferred maintenance." (Para. 1.A.)

The evidence presented by the Trustee and PTV establishes that while representatives of PTC and PTV appear to have signed the Lease Agreement in 2005, the companies never complied with its terms or modified the business arrangement between the parties through 2011. During this period, the companies continued to operate pursuant to the Management Agreement. Further, while some transition in business arrangement was attempted during 2012, it was incomplete and ineffective as of the bankruptcy filing.

Accordingly, the court finds based on the evidence presented that the parties failed to perform or act as if a lease existed between the parties. On that basis, the Lease Agreement, the Lease Extension and the Lease Amendment were not valid contracts between the parties, particularly where the parties performed in accordance with a different, and conflicting agreement.

Further, on February 21, 2013, the Trustee provided notice to PTV of his intent to terminate the Lease Agreement pursuant to its terms, without admitting its validity. The Trustee then provided a second

notice on August 30, 2013. Article 2 of the Lease Agreement, as well as Section 13 of the attached provisions, authorizes termination of the lease upon 30 days written notice, with or without cause. The Lease Extension modified the termination provisions by providing: "All other provisions within the original lease agreement shall remain as stated, excepting, of course, the (a) expiration date which is being extended as provided herein, and (b) that thereafter, the lease agreement shall be cancellable only upon either party giving to the other six (6) months written notice of termination." The termination notices provided by the Trustee satisfied both the 30 day and 6 month written notice requirements. Accordingly, the court finds that even if the Lease Agreement as extended or amended was valid, it was terminated pursuant to written notice by the Trustee on behalf of PTV.

## Termination of the Management Agreement

Article VII of the Management Agreement provides PTC with the right to terminate the agreement in the event that PTV is in material breach of any term or provision of the Management Agreement and such breach is not cured by PTV within 10 days after delivery of a written notice setting forth the nature of the breach. On August 30, 2013, the Trustee provided PTV with written notice that it was in material breach of the terms of the Management Agreement based upon:

- PTV's failure to turnover Clark Construction rents for May and June;
- PTV's inability to collect and remit Clark Construction rents for July and August;

8

- PTV's failure to turnover Performance Contracting, Inc. rents since the filing of the petition on August 6, 2012;
- PTV's failure to turnover Safe Parking and Budget collections for the second half of July 2013 and the first half of August 2013;
- PTV's failure to turnover Avila Trucking rents for July and August 2013; and
- PTV's failure to turnover Mujeres Unidas Y Activas rents for July and August 2013.

The breaches identified in the notice were not cured within 10 days. Accordingly, the Management Agreement was terminated as of September 10, 2013. For the purposes of calculating fees due pursuant to the Management Agreement, the Trustee assumed a management fee was due through October 2013, as the Preliminary Injunction finding termination and ordering turnover was not entered until November 18, 2013.

### Whether funds are due from PTV to PTC

In the complaint, Trustee requested turnover of books and records to determine amounts due to PTC from PTV. The Trustee did not receive books and records related to this request. Now, the Trustee seeks judgment against PTV of $1,278,891 for funds the Trustee asserts are due to PTC.

The Trustee bears the burden of persuasion on his claim. Once he establishes the basis of his claim, PTV has the burden of producing evidence to rebut the claim. Fed. R. Evid. 301.

9

The Trustee made the following demand:

- Prepetition - Note Receivable - PTV (12/31/11)  $712,206
- Postpetition:
  - All Property Rents received by PTV and PTC  $1,820,920
  - Less: Rents Paid to PTC  ($1,116,886)
  - Less: Payments made on Note Receivable  ($43,138)
  - Less: Management Fees through 10/14/13  ($109,255)
  - Plus: PTV Cash Balance (11/18/13)  $15,044
  - NET Postpetition Due  $566,685
- TOTAL  $1,278,891

Prepetition Demand

The Trustee asserted his claim for the prepetition demand based upon category 1274 on PTC's Balance Sheet Statement for a note receivable due from PTV. This note receivable category is provided for in PTC's records from at least 2006 through 2011 and grew from year to year. The Trustee has not identified a note to support this claim. His claim relies on the information used to generate the balance sheet contained in a QuickBooks version identified as the correct version by PTC's tax accountant, Mr. Brophy. At trial, Mr. Brophy testified that he had never seen a note, and that his tax preparations are based on the information as maintained in PTC's QuickBooks.

At trial, PTV established through cross-exam of the Trustee that although PTC's balance sheet showed a note receivable, neither PTV's balance sheet nor its QuickBooks carried a corresponding entry for a note payable. Instead, PTV identified a separate "2200 Due to/from

10

PTC" category maintained in PTC's QuickBooks. The amounts due at year end 2008, 2009, 2010 and 2011 closely match the PTV notes payable balances on PTC's books for each of these years.[3] Mr. Brophy testified that in his work with PTC and PTV the 2200 category represents a transfer of cash between the two entities, generally on the basis of expense reimbursements. The 2200 category would be used by the person entering activity into QuickBooks if they were not sure in what category the entry should be placed. The entries in this "ask Tim" account were to be reviewed and re-categorized later.

Ms. Manning, PTV's bookkeeper for approximately 10 years, credibly testified to financial transactions between PTC and PTV consistent with the Management Agreement. Ms. Manning's duties included maintaining PTV's QuickBooks and preparing invoices. She regularly issued invoices from PTV to PTC for management fees and funds needed from PTC to cover vendor expenses paid by PTV on PTC's behalf. The standard process was that an invoice would be received by PTV from a vendor and entered into PTV's records. Once the vendor was recognized as a vendor for the Oakland facility, an invoice would be issued to PTC for the funds needed to pay the vendor. All of PTV's invoices for 2007 and 2008 were admitted as evidence. These invoices show that most of PTV's invoices were issued to PTC each year. The invoices are for management fees,

---

[3]

| Year | PTV Note Receivable (Line 1274) | PTC Due to/Due from (category 2200) |
|------|--------------------------------|--------------------------------------|
| 2008 | $526,573 | $547,026 |
| 2009 | $581,492 | $590,846 |
| 2010 | $669,841 | $669,842 |
| 2011 | $712,206 | $711,207 |

11

funds to cover accounts payables and insurance. The invoices are electronically stamped as paid and include the date of payment. Each invoice for funds to cover accounts payables is also listed in the QuickBooks 2200 category report.[4] As listed in the financial reports filed with PTV's tax returns, these are funds for which PTV owes an obligation to PTC; however, no evidence was presented identifying on what basis an obligation would be due–and further, an obligation from PTV to PTC for these amounts is inconsistent with my finding that the Management Agreement represents the valid agreement and operation between the parties.

On the evidence presented, I find that the Trustee's assertion of a note receivable balance is not persuasive. Neither a note nor a basis for a note receivable was identified. PTC's records on this point are limited, and PTV's records do not show a corresponding note payable. Instead, PTV's records identify similar amounts as expenses paid in connection with PTV's management of PTC's self-storage and commercial real property facilities. As such, I find that the Trustee has not established his claim for recovery of a prepetition note receivable.

### Postpetition Demand

When PTC filed its chapter 11 case, a significant change in operations occurred. During the postpetition period, PTV collected and

---

[4] The invoices for management fees are not included in the category 2200 QuickBooks account.

12

kept all rents received. It then paid expenses on PTC's behalf and turned over the remaining rents to PTC. This change had two effects. First, as PTC did not collect or turnover all rents due from several commercial property tenants, it led to a default under the Management Agreement, and the Trustee's termination of that agreement for cause. Second, the Trustee disputes whether the postpetition funds paid by PTV on PTC's behalf were valid and appropriate expenses of the estate and asserts a claim for recovery of all rents received, less PTV's management fees. The Trustee asserts a claim for $566,685 for the difference between postpetition rents received and amounts turned over to PTC as rent or other payments, less the management fees due to PTV postpetition.

PTV asserts that the difference is for postpetition business expenses incurred in the ordinary course of business. PTV does not provide any invoices or other support evidence regarding the use of funds.[5] Instead, it relies on an interim report filed by the Trustee after the Management Agreement was terminated, wherein the Trustee asserts that expenses related to operation of the property are approximately $40,000 per month.

The court finds the Trustee's interim report insufficient to rebut Trustee's evidence in support of a postpetition claim. The Trustee

---

[5] PTV's introduction of its 2007 through September 30, 2012 bank statements is unavailing. These postpetition statements only cover two months of the postpetition period. Further, the transaction descriptions fail to identify whether a purchase was made for PTC's business expenses or how purchases made for plane tickets, rental cars and restaurants are for the benefit of PTC.

13

identifies generally expenses incurred related to operation of the property but does not state the status of payment on such expenses, or whether PTV used rents solely for operating expenses. Further, the Trustee testified that based upon his review of PTV's books and records for this period, PTV made numerous payments from the PTC rents not appropriately expenses of operation. These include payments to professionals not hired by the PTC bankruptcy estate, Hawaii travel and condominium expenses, payment on a judgment against Whitney and insurance and travel reimbursement of Whitney. While it appears PTV applied some portion of the postpetition rents demanded for expenses related to PTC's business, I find the evidence presented insufficient to determine an amount attributable to PTC's expenses. The Trustee established that the postpetition rents received by PTV on behalf of PTC are property of the estate and PTV did not establish an amount to be setoff against PTV's required turnover of estate property.

## Conclusion

For the reasons stated herein, the court finds:

(1) That the Lease Agreement was signed but never effectuated by PTC and PTV. As a result, enforcement of the Lease Agreement, Lease Extension and Lease Addendum was waived by the parties. If the Lease Agreement was ever valid, it was terminated by the Trustee by notice pursuant to its terms.

(2) That the Management Agreement was the agreement by which the parties operated. This agreement was terminated by the Trustee for cause as of August 30, 2013, however, PTV continued to

14

provide services through entry of the Preliminary Injunction. PTV is entitled to receive management fees through October 14, 2013 based upon the turnover of operations.

(3) A final injunction should be entered consistent with the Preliminary Injunction providing for termination and turnover of PTV's business operations, prohibiting further involvement of Whitney, Worsley and other Restrained Parties (as defined in the Preliminary Injunction) in PTV's current business operations, and such further relief as ordered in the Preliminary Injunction.

(4) The Trustee did not establish that PTC's estate is entitled to a judgment of $712,206 against PTV for a prepetition Note Receivable.

(5) The Trustee established, and PTV did not rebut, that PTC's estate is entitled to a judgment of $566,685 against PTV for postpetition rents received and not turned over to PTC.

The Trustee is directed to submit a judgment consistent with this decision.

**END OF ORDER**

15

COURT SERVICE LIST

All Recipients

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
1300 Clay Street (2d fl.)
Oakland, CA. 94612